## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

ASHLEY NEIL, :
:
Plaintiff : No. 3:13-CV-3013
:
vs. : (Judge Nealon)
:
CAROLYN W. COLVIN, Acting :
Comissioner of Social Security, :
:
Defendant :

FILED
SCRANTON

NOV 2 1 2014

PER
DEPUTY CLERK

## MEMORANDUM

On December 16, 2013, Plaintiff, Ashley Neil, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying her application for disability

insurance benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 1461 et

seq., 1381 et seq. (Doc. 1). The parties have fully briefed the appeal, and the

matter is now ripe for review. For the reasons set forth below, the decision of the

Commissioner denying Plaintiff's applications for DIB and SSI be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] her applications for DIB and SSI on October 19, 2010. (Tr. 11).[3] These claims were initially denied by the Bureau of Disability Determination ("BDD")[4] on December 1, 2010. (Tr. 11). On January 18, 2011, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 11). A hearing was held on April 18, 2012, before administrative law judge Patrick Cutter ("ALJ"), at which Plaintiff and vocational expert Michael Kibler ("VE") testified. (Tr. 11). On May 21, 2012, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff's impairments did not meet or medically equal any impairment Listing, and she could perform a full range of light work with restrictions. (Tr. 15).

On July 19, 2012, Plaintiff filed a request for review with the Appeals Council. (Tr. 6). On October 24, 2013, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus,

---

2. Protective filing is a term for the first time an individual contacts the SSA to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on February 28, 2014. (Doc. 9).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the SSA.

the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on December 16, 2013. (Doc. 1). On February 28, 2014, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed the brief in support of her complaint on July 15, 2014. (Doc. 19). Defendant filed a brief in opposition on August 15, 2014. (Doc. 20). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on March 8, 1986, and at all times relevant to this matter was considered a "younger individual."[5] (Tr. 153). Plaintiff obtained her GED, and can communicate in English. (Tr. 155, 157). Her employment records indicate that she previously worked as a driver, fraud specialist, patient care assistant ("PCA"), and waitress. (Tr. 157).

Plaintiff's alleged disability onset date is July 9, 2009. (Tr. 153). The impetus for her claimed disability as noted in her Disability Report is a combination of the following: Crohn's Disease, Acid Reflux Disease, anxiety, depression, obesity, and fatty liver. (Tr. 156). Plaintiff completed an Adult

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

Function Report on November 4, 2010. (Tr. 164). She indicated that she was living in a mobile home with her two (2) children and her boyfriend. (Tr. 164). A typical day involved getting her daughter ready for school, feeding her children breakfast, getting her daughter on the bus, cleaning her house, attending doctor's appointments, getting her daughter off the bus, making dinner, bathing her daughter, getting her daughter ready for bed, and then going to bed herself. (Tr. 164). The pain from her Crohn's disease interrupted her sleep because she would have to wake up to use the bathroom, but Plaintiff did not indicate that it affected her ability to take care of her personal needs. (Tr. 165). Without help, encouragement, or accompaniment, Plaintiff went to the grocery twice a month for an hour at a time, prepared meals daily for a half hour to an hour at a time, cleaned her house daily for four (4) hours at a time, did the laundry, ironed, mowed the lawn, and drove a car. (Tr. 166-167). She indicated that she did not have a problem walking. (Tr. 169).

Regarding concentration and memory, Plaintiff was able to take care of her personal needs and take her medicine without reminders. (Tr. 166). She was able to pay bills, count change, handle a savings account, and use a checkbook. (Tr. 167). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check concentration or completing tasks. (Tr. 169). She

indicated that she had trouble completing tasks because of having to use the bathroom so often, but that she did not have issues following either written or spoken instructions. (Tr. 169-170).

Socially, Plaintiff visited with her family and had family dinners about once a month. (Tr. 168). She indicated that she did not "really go anywhere" because she would get nervous as she never knew when having to use the bathroom would occur. (Tr. 168, 170). With regards to hobbies and interests, Plaintiff liked to read and watch television. (Tr. 168). She indicated that she got along well with others and handled stress and changes in routine well. (Tr. 170).

At her April 18, 2012 hearing, Plaintiff testified that she was disabled based on the following impairments: Crohn's disease, anxiety, arthritis, obesity, depression, and acid reflux. (Tr. 34, 37, ). She indicated that she had worked part-time as a waitress since July of 2009 for four (4) hours a day, five (5) days a week, and was fired four (4) weeks prior to the hearing. (Tr. 36, 41). She testified that she primarily could not work because of the symptoms she experienced as a result of the Crohn's disease, which included nausea, bloating, diarrhea, pain, and having to use the bathroom many times a day. (Tr. 36-37). She stated that she received Remicade infusion treatments every six (6) weeks that eased the bloating, cramping, and frequency of her bowel movements. (Tr. 37). These treatments

caused her to experience bad headaches and sleepiness on the day of treatment. (Tr. 37).  With regards to her arthritis, she testified that it caused her pain in her feet, hips, ankles, and hands, causing pain when walking, and difficulty opening things like soda bottles. (Tr. 37-38).  Treatment for her arthritis included Remicade and steroids. (Tr. 38).  With regards to anxiety, Plaintiff states that it would cause her to become dizzy, to have difficulty talking to people, and to have numbness in her hands. (Tr. 38).  Her anxiety attacks occurred about once a week, and treatment included Xanax, which helped, and therapy, which did not.  (Tr. 38-39).

She stated that a typical day included getting her daughter off to school, doing the dishes, sitting on a heating pad, napping, sweeping the floor, watching television, reading, and folding the laundry when it was brought to her. (Tr. 40). She testified that she did not make her daughter breakfast because she ate breakfast at school, and that she normally would not eat in the morning if she had work at night. (Tr. 40).  She followed a special diet for Crohn's disease, including avoidance of fresh fruit, vegetables, hot food, and dairy. (Tr. 41, 46).

She testified that she had gotten into trouble and had been fired from work because of having to call in sick due to her Crohn's disease flares. (Tr. 42). Plaintiff stated that, on a good day, she would use the bathroom eight (8) to ten

(10) times a day, and ten (10) to twenty (20) times a day on a bad day, which occurred at least twice a week. (Tr. 42-43). Plaintiff testified that she avoided eating before work so that she would have to use the bathroom only one (1) to two (2) times while working, but that when she ate when she got home from work at about nine o'clock (9:00) at night, she would eat and then would be up all night using the bathroom. (Tr. 49). When her flares occurred, she would sleep often during the day because of frequently waking at night to use the bathroom. (Tr. 44). Plaintiff previously had surgery, during which Dr. Berk removed thirteen (13) inches of her bowel. (Tr. 43-44). Dr. Berk told her the Crohn's would most likely get progressively worse likely necessitating another surgery within the next ten (10) years. (Tr. 43-44).

## **MEDICAL RECORDS**

On January 8, 2009, Plaintiff had an appointment at Carlisle Digestive Disease Association ("CDDA") for an infusion of Remicade. (Tr. 200). The exam noted Plaintiff was positive for rash, back pain, nausea, vomiting, diarrhea, change in bowel habits, headaches, depression, feeling cold, and excessive thirst. (Tr. 200-201).

On January 14, 2009, Plaintiff had an appointment with Dr. Berk for complaints of worsening diarrhea, vomiting, and abdominal pain, and a history of

Crohn's disease. (Tr. 229).  Her history noted that she was hospitalized at

Chambersburg Hospital in August of 2008, during which a CT scan revealed

thickening and distention of the ileum loops. (Tr. 229).  An endoscopy performed

in October of 2008 revealed marked inflammation of the distal small bowel with

active bleeding, for which Plaintiff was treated initially with Entocort and Pentasa.

Dr. Berk prescribed Remicade treatments for Plaintiff in December of 2008. (Tr.

229).  Plaintiff reportedly felt better after her first treatment, but then began to

experience recurrent symptoms. (Tr. 229).  Her January 8, 2009 infusion showed

no obvious improvement. (Tr. 229).  She stated that she was absent from work

from December 11, 2008 to January 13, 2009 during the latest Crohn's flare, that

her job was stressful, and that she had to call off work several times due to

abdominal cramping, vomiting, increased bowel movements up to six (6) times a

day, and interrupted sleep due to pain. (Tr. 229).  Her exam was positive for

fatigue, palpitations, back pain, poor appetite, nausea, vomiting, bloating,

belching, diarrhea, abdominal pain, change in bowel habits, headaches,

depression, and feeling cold. (Tr. 230).  Dr. Berk recommended that Plaintiff

discontinue Pentasa, and undergo a CT scan. (Tr. 231).

On January 15, 2009, Plaintiff underwent a CT scan of her abdomen and

pelvis with contrast that was ordered by Dr. Berk. (Tr. 227).  The scan revealed a

thickening of the mucosa of the terminal ileum with minimal inflammatory change in the adjacent mesentery and a suspect small right ovarian cyst. (Tr. 228).

On January 21, 2009, Plaintiff spoke with Dr. Berk by telephone, and reported that she felt like a "new person" due to a tremendous improvement in the frequency of diarrhea and abdominal pain following her recent Remicade infusion. (Tr. 225). Dr. Berk advised that Plaintiff continue with the Remicade infusions. (Tr. 225).

On January 26, 2009, Plaintiff underwent a CT scan with contrast of her abdomen and pelvis. (Tr. 224). The scan revealed a thickened wall of the distal ileum consistent with Plaintiff's Crohn's disease history and large areas of hypodensity in the liver representing fatty infiltration. (Tr. 224).

On February 2, 2009, Plaintiff had a follow-up appointment with Dr. Berk for abdominal pain, nausea, and diarrhea. (Tr. 221). She told Dr. Berk that she had a positive response to the Remicade, but that a week prior to the onset of menstruation, she experienced abdominal cramps and diarrhea. (Tr. 221). As a result, she made an appointment with a gynecologist at Keystone Women's Center. (Tr. 221). Her exam was positive for weight gain, fatigue, joint pain, back pain, heartburn, nausea, vomiting, bloating, belching, headaches, depression, and feeling cold. (Tr. 222). Dr. Berk instructed Plaintiff to continue with the

Remicade infusions, and scheduled a three (3) month follow-up visit. (Tr. 223).

On February 4, 2009, Plaintiff had a Remicade infusion at CDDA. (Tr. 218). Her exam was positive for weight gain, fatigue, joint pain, back pain, abdominal pain, headaches, and depression. (Tr. 219-220).

On March 11, 2009, Plaintiff called Dr. Berk to inquire as to whether the migraine headaches that occurred on the day of and the day after her infusion treatments were a side effect of the Remicade treatments. (Tr. 217). She also reported that prior to beginning the infusions, she had no history of migraine headaches. (Tr. 217). Dr. Berk returned Plaintiff's call on March 12, 2009, and informed her that headaches are a side effect of Remicade, but she resisted switching to a different medicine because the Remicade helped her gastrointestinal symptoms. (Tr. 217).

On March 20, 2009, Plaintiff had an appointment with Dr. Dhanyamraju for complaints of frequent migraine headaches. (Tr. 364). Plaintiff stated that they were a result of her Remicade treatments, and that she had been unable to work after those treatments because of the abdominal pain and headaches they caused. (Tr. 364). At the time of the appointment, Plaintiff was free of abdominal pain, nausea, vomiting and diarrhea. (Tr. 364). Her anxiety and depression symptoms had not been improving with Celexa so she was switched from Celexa to Zoloft.

(Tr. 364).  She also was prescribed Propanolol for her migraines.  (Tr. 364).

On March 24, 2009, Plaintiff called Dr. Berk to report that she had been experiencing moderate to severe abdominal pain, pain when walking and sitting, ten (10) or more bowel movements ("BM") per day, and diarrhea.  (Tr. 216).  She stated that she was unable to work because of these symptoms.  (Tr. 216).  Dr. Berk returned her call that night, and told her to keep track of whether these episodes of diarrhea and pain were related to the Remicade infusions.  (Tr. 216).

On  April 6, 2009, Plaintiff had a Remicade infusion at CDDA.  (Tr. 211).  Plaintiff stated that she had been feeling better with no abdominal pain, had approximately two (2) loose stools per day, and that the Remicade treatments had also been improving her psoriasis symptoms.  (Tr. 212).  She reported that she had been vomiting about three (3) times a week, and had pain when swallowing.  (Tr. 212).

On April 13, 2009, Plaintiff underwent a pelvic laproscopy performed by Soheal Raschid, M.D. at Chambersburg Hospital in order to evaluate her abdominal pain.  (Tr. 575).   The results of this test were normal, with no evidence of endometriosis.  (Tr. 575).

On April 17, 2009, Plaintiff called Dr. Berk because she had been experiencing nausea, vomiting three (3) times a week, abdominal cramping,

11

distention and pain, painful bowel movements ("BM"), and loose stools. (Tr. 210). Dr. Berk returned Plaintiff's phone call on April 20, 2009, and referred Plaintiff for an obstruction x-ray series. (Tr. 210).

On April 30, 2009, Plaintiff presented to the emergency room ("ER") Chambersburg Hospital for recurrent nausea, vomiting, and abdominal distention and pain. (Tr. 206, 398). A CT scan revealed significant thickening of the terminal ileum with surrounding mesenteric edema and a small amount of free fluid in the pelvis with a degree of small bowel obstruction. (Tr. 206, 401). Plaintiff was hospitalized, treated with Ciproflaxin and intravenous ("IV") steroids, and discharged on May 3, 2009 with Prednisone and Ciproflaxin prescriptions. (Tr. 206, 399, 402).

On May 4, 2009, Plaintiff had a follow-up appointment with Dr. Berk at CDDA for abdominal pain and vomiting after her April 29, 2009 hospital visit. (Tr. 206). She reported that since her hospitalization a week prior, she felt better, but still had nausea and significant cramping. (Tr. 206). Dr. Berk explained to Plaintiff that the Remicade would help relieve obstruction of an inflammatory nature, but that this therapy would not help an obstruction due to scar tissue. (Tr. 208). As a result, Dr. Berk referred Plaintiff to Dr. Mazza with Sollenberger Associates for a May 11, 2009 surgical consultation. (Tr. 208).

On May 13, 2009, Plaintiff had an upper gastrointestinal ("GI") endoscopy performed by Theodore Berk, M.D. at CDDA. (Tr. 202). The results of this test were normal. (Tr. 202-204).

On May 19, 2009, Plaintiff called Dr. Berk to report that she was still having a lot of abdominal cramping, but no vomiting, and that she decreased her Prednisone dose to twenty milligrams (20mg) per his recommendation. (Tr. 289). She stated she would be off of work until after her surgery with Dr. Mazza on June 5, 2009. (Tr. 289). Dr. Berk recommended that Plaintiff increase her Prednisone dose to twenty-five milligrams (25mg) to see if that would help with her abdominal cramping. (Tr. 289).

On June 2, 2009, Plaintiff had a Remicade infusion at CDDA. (Tr. 286). A review of her symptoms noted that she was positive for joint pain, but negative for any gastrointestinal symptoms. (Tr. 288).

On June 4, 2009, Plaintiff had a pre-surgical appointment with Dr. Mazza. (Tr. 322). It was noted that Plaintiff did not have headaches or joint pain, and had a good appetite and diarrhea. (Tr. 322). It was also noted that Plaintiff had multiple lesions on her liver compatible with fatty infiltration of the liver, and that Plaintiff had intractable terminal ileal Crohn's disease. (Tr. 323). Dr. Mazza recommended that Plaintiff undergo an ileocolic resection in order to improve the

13

terminal ileum. (Tr. 323).

On June 5, 2009, Plaintiff underwent a laproscopic ileocolectomy performed by Dr. Mazza at Carlisle Medical Center. (Tr. 324, 330).  During this surgery, Dr. Mazza removed thirteen (13) inches of Plaintiff's ileum that was thickened, ulcerated, fissured, and disorted due to Crohn's disease. (Tr. 333).  There were no complications as a result of the surgery. (Tr. 330).

On June 6, 2009, Plaintiff had a post-surgical appointment with Dr. Berk. (Tr. 283).  Plaintiff's exam was positive for joint pain, pruritus, and abdominal tenderness. (Tr. 284).  Dr. Berk discussed post-surgical management of Plaintiff's Crohn's disease, including the continuance of the Remicade treatments or switching her to Azathioprine. (Tr. 284).

On June 8, 2009, Plaintiff was discharged after her surgery by Larry Sollenberger, M.D. (Tr. 320).  She was prescribed the following medications: Xanax, Zoloft, Nexium, Yasmin, Prednisone, and Percocet, and was instructed to follow a low residue diet. (Tr. 320).

On June 11, 2009, Plaintiff had a follow-up visit with Dr. Berk. (Tr. 279). She reported that she was eating normal food such as chicken and mashed potatoes, and that her obstruction pain had resolved, but that she had a pain in her lower right quadrant that was significant and exacerbated by urination and

defecation. (Tr. 279).  She had a strong preference to continue the Remicade treatments, and noted that the Prednisone had been making her irritable. (Tr. 279). (Tr. 279).  Her exam was positive for joint pain, poor appetite, bloating, abdominal pain, change in bowel habits, feeling cold, and a tendency to bruise. (Tr. 280). Dr. Berk recommended that Plaintiff taper her Prednisone dosage by five milligrams (5mg) every three (3) days. (Tr. 281).

On July 2, 2009, Plaintiff had an appointment with Dr. Dhanyamraju for her anxiety.  She stated that Lexapro, Citalopram and Zoloft made her anxiety worse. (Tr. 361).  She denied any depression symptoms, and stated she was feeling more anxious after dealing with the aftermath of her bowel resection surgery and the infection it caused. (Tr. 361).  She reported that her headaches were better, and that she thought they were mostly due to stress. (Tr. 361).  She was prescribed Xanax, and was told to make an appointment with the behavioral health department. (Tr. 361).

On July 27, 2009, Plaintiff received a Remicade infusion at CDDA. (Tr. 274).  Plaintiff had been experiencing five (5) to six (6) loose stools a day, nausea, and bloating for the past several weeks. (Tr. 274).  She was instructed to call Dr. Berk to inform him of whether the infusion helped her symptoms. (Tr. 274).

On July 27, 2009, Dr. Mazza sent a letter to Dr. Berk discussing the

outcome of Plaintiff's surgery. (Tr. 389). In the letter, Dr. Mazza stated that Plaintiff developed a superficial umbilical infection, but that she otherwise had done well postoperatively, with only mild nausea, a good appetite and bowel function, and occasional diarrhea episodes. (Tr. 389). Her pathology report revealed Crohn's disease involving the terminal ileum. (Tr. 389). Dr. Mazza cleared Plaintiff to go back to work in July of 2009. (Tr. 389).

On July 30, 2009, Plaintiff spoke with Dr. Berk, informing him that since the Remicade infusion, her abdominal pain was slightly improved, but her diarrhea had not improved at all, as she was having five (5) to six (6) bowel movements a day. (Tr. 271). Dr. Berk discussed the possibility of an infection, prescribed Ciproflaxin, and scheduled a colonoscopy for Plaintiff. (Tr. 271).

On August 26, 2009, Plaintiff had an appointment with Dr. Berk. (Tr. 385). She reported that she had breakthrough heartburn and regurgitation, and that she continued to receive the Remicade infusions. (Tr. 385). Her exam was positive for weight gain, fatigue, palpitations, heartburn, regurgitation, diarrhea, abdominal pain, change in bowel habits, headaches, depression, feeling cold, and easy bruising. (Tr. 386). Dr. Berk recommended that she try Imodium if she anticipated being in a situation where access to a bathroom would be a problem. (T. 387).

16

On September 21, 2009, Plaintiff received a Remicade infusion at CDDA. (Tr. 550). She stated that she had been having diarrhea four (4) to five (5) times on some days, and continued to have discomfort at her incision site. (Tr. 550). Her exam was positive for weight gain, heartburn, diarrhea, headaches, depression, and easy bruising. (Tr. 552).

On November 16, 2009, Plaintiff had a Remicade infusion at CDDA. (Tr. 547). Her exam was positive for heartburn and diarrhea. (Tr. 549).

On November 25, 2009, Plaintiff had an appointment with Dr. Dhanyamraju for increasing anxiety episodes. (Tr. 359). She stated that she was unable to control her anxiety without medication, and tried several anti-depressants which did not help. (Tr. 359). She was also experiencing depression due to Crohn's disease. (Tr. 359). It was reported that Plaintiff was crying at her appointment. (Tr. 359). She was prescribed Wellbutrin and Xanax, and was referred to Summit Behavioral Health for an evaluation and management. (Tr. 359).

On December 31, 2009, Plaintiff spoke with John Verreccio, M.D. with CDDA, and reported that she had been experiencing dull lower right quadrant pain and six (6) to seven (7) bowel movements daily for the past three (3) weeks, with an increase to eight (8) to ten (10) times a day for the prior week, with occasional nocturnal diarrhea. (Tr. 546). Dr. Verrecchio prescribed Prednisone, and

17

suggested a Remicade increase. (Tr. 546).

On January 6, 2010, Plaintiff had an appointment with Dr. Berk for complaints of diarrhea with six (6) to seven (7) bowel movements a day, abdominal bloating, and right lower quadrant cramping. (Tr. 383). She stated that her symptoms improved with the Remicade infusions, and Dr. Berk increased the dosage as a result because she was having more frequent flares. (Tr. 383).

On January 11, 2010, Plaintiff received a Remicade infusion at CDDA. (Tr. 538). She was having three (3) to four (4) semi-formed stools daily, and had still been experiencing abdominal pain and cramping during bowel movements, and occasionally throughout the day, but overall she felt the Prednisone helped during a Crohn's flare. (Tr. 538-539). Her exam was positive for fatigue, rash, nausea, vomiting, diarrhea, bloating, abdominal pain, and a change in bowel habits. (Tr. 539-540).

On January 13, 2010, Plaintiff presented to Syyeda Syed, M.D. at Summit Behavioral Health for complaints of anxiety and depression. (Tr. 339). She was referred by Dr. Dhanyamraju. (Tr. 339). Plaintiff stated that she had been experiencing severe depression, anxiety, and panic attacks that began in early 2009, during which she felt shortness of breath, sweating, palpitations, and light headedness. (Tr. 340). These problems began when Plaintiff's gastrointestinal

18

symptoms began. (Tr. 340). Plaintiff did not tolerate Lexapro, Celexa, or Zoloft

that had been prescribed by Dr. Dhanyamraju because it gave her gastrointestinal

side effects. (Tr. 340). Despite taking Xanax and Wellbutrin, Plaintiff's anxiety

persisted and increased. (Tr. 340). She reported that she was taking four (4) to six

(6) Xanax daily. (Tr. 340). With regards to her depression, Plaintiff reported that

she felt hopeless, worthless, helpless, and guilty, and had problems sleeping,

focusing, and concentrating. (Tr. 340). She stated that her obsession with

cleaning had increased because it made her feel better, and that otherwise she did

not have any other compulsions or obsessions. (Tr. 340). She also reported being

fearful of starting a new job because of the possibility of being fired during

Crohn's flares that caused an inability to work. (Tr. 340). Her medications at this

appointment included Xanax, Wellbutrin, Remicade, Prednisone, and Aciphex.

(Tr. 341). Plaintiff's exam noted that her mood was depressed, her affect was

tearful and anxious, her thought content was depressed and anxious, her judgment

was intact, her insight was fair, and her intelligence was average. (Tr. 341). Her

Axis I diagnosis included Mood Disorder with depressive features due to a

medical condition, Generalized Anxiety Disorder ("GAD"), Panic Disorder

without agoraphobia, and recurrent Major Depressive Disorder. (Tr. 342). Her

Global Assessment Function ("GAF")[6] score at this appointment was a fifty (50).

---

6. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. American Psychiatric Association (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.). Washington, DC: Author. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. Id. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. Id.

     Recently, the American Psychiatric Association no longer uses the GAF score for assessment of mental disorders due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed. Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16 (2013). As a result, the SSA permits ALJs to use the GAF score as opinion evidence when analyzing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and the ALJ, therefore, should not "give controlling

(Tr. 342).  Dr. Syed instructed Plaintiff to taper off the Wellbutrin, to continue on Klonopin, to take Xanax only for panic attacks, and to start Remeron.  (Tr. 342).  He also recommended psychotherapy, and scheduled a follow-up for Plaintiff in two (2) weeks.  (Tr. 342).

On February 3, 2010, Plaintiff had a follow-up appointment with Dr. Syed for depression and anxiety.  (Tr. 352).  She reported that she had been feeling better, but that she still had a lot of anxiety.  (Tr. 352-353).  She also noted that she had been getting along well with family, that her emotions were up and down, that her sleep and appetite were good, and that she had been feeling good with regards to her Crohn's disease.  (Tr. 353).  Her GAF was between a fifty (50) and sixty (60).  (Tr. 352).

On March 3, 2010, Plaintiff had a Remicade infusion at CDDA.  (Tr. 531).  Plaintiff reported that she felt the Remicad helped her gastrointestinal symptoms as she had less abdominal pain and cramping, and her bowel movements had decreased from nine (9) a day, to four (4) to five (5) loose stools a day.  (Tr. 531).  She also noted that she had been experiencing lower right quadrant pain that increased with bowel movements.  (Tr. 532).  Her exam was positive for weight

---

weight to a GAF from a treating source unless it is well[-]supported and not inconsistent with other evidence."  SSA AM-13066 at 5 (July 13, 2013).

gain, fatigue, a rash, heartburn, diarrhea, abdominal pain, and headaches. (Tr. 532-533).

On March 4, 2010, Plaintiff had a follow-up appointment with Dr. Syed for anxiety and depression. (Tr. 350). She noted that her emotions had been up and down, her appetite and sleep were good, she was having some issues getting along with her family, she had not been working, and she had not been having as much anxiety. (Tr. 351). Her GAF was a fifty (50).

On April 8, 2010, Plaintiff had a follow-up appointment with Dr. Berk. (Tr. 311). It was noted that a colonoscopy performed in January of 2010 showed no significant evidence of recurrent Crohn's disease, and that Dr. Berk had prescribed Ciproflaxin for Plaintiff for a possible infection in March of 2010. (Tr. 311). Plaintiff reported that she had been feeling better, and had been having four (4) to five (5) bowel movements a day that were not as loose as they had been. (Tr. 311). Dr. Berk noted a fifty-five pound (55 lb.) weight gain, and attributed it to Plaintiff's psychiatric medication, which caused an increased appetite. (Tr. 311). Her exam was positive for weight gain, back pain, bloating, diarrhea, abdominal pain, depression, and feeling cold. (Tr. 309-310).

On April 8, 2010, Plaintiff had a follow-up appointment with Dr. Syed for anxiety and depression. (Tr. 348). She reported that she had been doing a little

22

better, that her appetite and sleep were good, that her emotions were up and down, and that she was getting along with her family, but that the Remeron was causing weight gain. (Tr. 348-349). Her GAF was a fifty-five (55). (Tr. 348).

On May 3, 2010, Plaintiff had a Remicade infusion at CDDA. (Tr. 513). Plaintiff reported that she had been experiencing lower right quadrant pain that would come and go, but there were days it was constant. (Tr. 513). She had four (4) to five (5) bowel movements a day. (Tr. 513). Her exam was positive for back pain, bloating, and depression. (Tr. 515).

On May 7, 2010, Plaintiff had a follow-up appointment with Dr. Syed for anxiety and depression. (Tr. 346). Plaintiff was not doing well after finding out there was something wrong with her liver. (Tr. 346). Her emotions were up and down, her sleep and appetite were good, she was not working, and she was getting along well with others. (Tr. 347). The psychiatric medications had been taking "the edge off." (Tr. 347). Her GAF was a fifty-five (55). (Tr. 346).

On May 25, 2010, Plaintiff called Dr. Berk because she had been having increased abdominal pain. (Tr. 511). She denied having any diarrhea, and stated that the pain would come and go. She was having approximately six (6) to seven (7) bowel movements a day, and felt instantly bloated after eating. (Tr. 511). Dr. Berk suspected an infection, and prescribed a ten (10) day course of Ciproflaxin. (Tr. 511).

On June 7, 2010, Plaintiff had an appointment with Dr. Syed for complaints of mood swings and anxiety. (Tr. 344). She reported that her emotions had been up and down, her sleep and appetite were good, she had not been working, she had been getting along with her family, and she had difficulty taking the depression medications because of the effect it had on her gastrointestinal symptoms. (Tr. 345). Her diagnosis included depression and anxiety, and her GAF was a fifty-five (55). (Tr. 345).

On June 10, 2010, Dr. Berk called Plaintiff to inform her that her liver tests were elevated, and that she had a positive antinuclear antibody ("ANA") test, possibly due to autoimmune hepatitis. (Tr. 312). Dr. Berk ordered a liver biopsy as a result of these elevated liver levels. (Tr. 312).

On June 12, 2010, Plaintiff went to the ER at Chambersburg Hospital for severe low back pain that had been occurring for two (2) days. (Tr. 374). Plaintiff denied any headaches or gastrointestinal issues. (Tr. 374). The cause of her back pain was never found, and she was sent home with a Vicodin prescription. (Tr. 375).

On June 14, 2010, Plaintiff had an appointment with Dr. Dhanyamraju at Keystone Family Health for a follow-up after the ER visit. (Tr. 355). She was unable to lie down, stand up or walk to due the back pain. (Tr. 355).

24

Straightening of her lumbosacral spine was observed. (Tr. 355). She was prescribed Flexeril and Vicodin. (Tr. 355).

On June 18, 2010, Plaintiff underwent a needle biopsy of her liver requested by Dr. Berk. (Tr. 314-317). The biopsy results indicated Plaintiff had Steatohepatitis, Grade 2, Stage 1. (Tr. 317).

On June 28, 2010, Plaintiff had a Remicade infusion at CDDA. (Tr. 503). Plaintiff stated that she had recently found out she was pregnanct, and denied any abdominal pain or bleeding. (Tr. 503-504). Her exam was positive for back pain and pregnancy. (Tr. 506). Dr. Berk reviewed the liver biopsy results in further detail, and emphasized that Plaintiff exercise and lose weight to control the fatty liver. (Tr. 503).

On August 24, 2010, Plaintiff received a Remicade infusion at CDDA. (Tr. 500). She reported that she had been experiencing increased cramping and loose stools in the amount of fifteen (15) to twenty (20) a day for the two (2) weeks before her next infusion treatment was due. (Tr. 500). She also noted that she had headaches after the Remicade infusions except when she was given "lots of fluid during the infusion." (Tr. 500-501). Her pregnancy measured at seventeen (17) weeks, and was going well. (Tr. 500).

On October 11, 2010, Plaintiff had a Remicade infusion at CDDA. (Tr.

498-499).  Plaintiff reported that she had continued to have up to ten (10) loose stools a day, abdominal pain, and bloating. (Tr. 498).  Her symptoms did not improve after the previous Remicade infusion in August. (Tr. 498).  She stated that her pregnancy had been progressing normally, and she was feeling well. (Tr. 498).

On November 29, 2010, Plaintiff received a Remicade infusion at CDDA. (Tr. 951).  Plaintiff was twenty-eight (28) weeks pregnant at this visit, had been feeling good, and was moving her bowels up to eight (8) times a day, which was normal for her. (Tr. 951).  Her exam was positive for ankle swelling, wheezing, diarrhea, abdominal pain, headaches, and pregnancy. (Tr. 953).

On December 1, 2010, Jan Melcher, Ph.D. performed a Psychiatric Review Technique. (Tr. 645).  Dr. Melcher concluded that Plaintiff had Mood Disorder and Anxiety Disorder that were medically determinable impairments under Listings 12.04 and 12.06, respectively, but that the diagnostic criteria for Listings 12.04 and 12.06 were not satisfied. (Tr. 648, 650).  With regards to the "B" criteria for Listings 12.04 and 12.06, Dr. Melcher opined that Plaintiff had mild restrictions for activities of daily living and in maintaining social function, moderate difficulties in maintaining concentration, persistence and pace, and no repeated episodes of decompensation. (Tr. 655).  She also opined that evidence

26

did not establish the presence of "C" Criteria for Listing 12.04. (Tr. 656).

On December 1, 2010, Dr. Melcher also completed a Mental Residual Functional Capacity ("RFC") assessment. (Tr. 642). Dr. Melcher opined that Plaintiff was moderately limited in her ability to carry out detailed instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting. (Tr. 642-643). Despite these limitations, Dr. Melcher opined that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis. (Tr. 644).

On February 24, 2011, Plaintiff had an appointment with Dr. Dhanyamraju for back pain and anxiety. (Tr. 889). Plaintiff reported that she had been experiencing achy, sharp lower back pain that radiated to her buttocks. (Tr. 889). Her pain was aggravated by bending, and relieved by heat and ibuprofen. (Tr. 889). It was noted that Plaintiff had given birth ten (10) days prior to the appointment. (Tr. 889). Plaintiff also reported that she had been experiencing anxious and fearful thoughts, a depressed mood, fatigue, a loss of energy, and panic attacks. (Tr. 889). She denied any appetite changes, sleep disturbances, or

thoughts of suicide or death. (Tr. 889). Dr. Dhanyamraju ordered an x-ray of the lumbosacral spine, and prescribed ibuprofen, back exercises, Xanax, and Citalopram. (Tr. 889, 891).

On February 24, 2011, Plaintiff received a Remicade infusion at CDDA. (Tr. 945). Plaintiff complained of abdominal cramping, sharp pains, up to twenty (20) loose stool bowel movements a day, and increased acid reflux. (Tr. 945). Her last infusion was in November of 2010, as the infusions were suspended while Plaintiff was in her third (3rd) trimester until she delivered her baby on February 14, 2011. (Tr. 945). The exam was positive for fatigue, difficulty swallowing, heartburn, bloating, diarrhea, abdominal pain, and depression. (Tr. 946-947).

On April 8, 2011, Plaintiff had a Remicade infusion at CDDA. (Tr. 942). Plaintiff stated she had been having abdominal pain, was moving her bowels ten (10) to fifteen (15) times a day, and felt fatigued. (Tr. 942). She also felt emotional, and started a new anti-depressant as a result. (Tr. 942). Her exam was positive for fatigue, joint pain, bloating, belching, diarrhea, abdominal pain, and depression. (Tr. 943-944).

On April 18, 2011, Plaintiff had an appointment with Dr. Dhanyamraju for anxiety and depression. (Tr. 883). Plaintiff reported that it was difficult to meet her home, work, and social obligations, and that she had been experiencing

anxious, fearful thoughts and a depressed mood. (Tr. 883). It was noted that she had difficulty taking anti-depressants because they exacerbated her gastrointestinal symptoms. (Tr. 883). She denied having panic attacks, poor concentration, sleep disturbance, thoughts of suicide or death, or fatigue. (Tr. 883). Plaintiff was prescribed Klonopin, and was referred to Keystone Behavioral Health for an evaluation. (Tr. 883).

On May 4, 2011, Plaintiff had a follow-up appointment with Dr. Berk for her Crohn's disease. (Tr. 903). Plaintiff noted that her joint pain, psoriasis, and to some extent, her diarrhea and abdominal bloating, improved after the Remicade infusions. (Tr. 903). She reported that she had twelve (12) or more loose to watery bowel movements a day if she ate three (3) meals, and if she ate less, she had about eight (8) loose to watery bowel movements a day. Her most recent colonoscopy revealed one (1) small erosion in the neoterminal ileum. (Tr. 903). Plaintiff's exam was positive for joint pain, back pain, bloating, belching, regurgitation, diarrhea, abdominal pain, depression, feeling cold, and anemia. (Tr. 905). Dr. Berk recommended that Plaintiff cease drinking sweetened beverages in order to lose weight to help with her fatty liver, and Plaintiff was scheduled for a follow-up appointment in one (1) year. (Tr. 905).

On May 9, 2011, Plaintiff had an appointment with Irakli Mania, M.D. with

29

Keystone Behavioral Health for an initial psychiatric evaluation. (Tr. 1013).

Plaintiff complained that she experienced anxiety about five (5) times a week that

was "not really that bad except about 2-3 times a month." (Tr. 1013).  Her

symptoms included chest heaviness, tingling, lightheadedness, poor concentration,

constant worry, muscle tension, restlessness, and irritability. (Tr. 1013).  Her Axis

I description included anxiety, her Axis II included Panic Disorder, and her Axis

III included GAD. (Tr. 1014).  Her affect was appropriate, her mood was anxious,

her memory was intact, she was cooperative, her thought process was logical, and

her attention, reasoning, impulse control, and judgment were good. (Tr. 1015).

Dr. Mania prescribed Klonopin and Buspirone, and Plaintiff was scheduled for a

follow-up visit in one (1) month. (Tr. 1016).

     On May 23, 2011, Plaintiff received a Remicade infusion at CDDA. (Tr.

935).  Her exam at this visit was positive for fatigue, joint pain, back pain,

bloating, belching, diarrhea, memory loss, and depression. (Tr. 936-937).

     On June 6, 2011, Plaintiff had an appointment with Dr. Mania. (Tr. 1009).

She reported feeling the same as her May 2011 appointment, and that her new job

as a food server was a mild stressor. (Tr. 1009).  Her Axis I description included

GAD and Panic Disorder. (Tr. 1009).  Her affect was appropriate, her mood was

anxious, her memory was intact, she was cooperative, her thought process was

logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 1010). Dr. Mania prescribed Lorazepam in place of Klonopin and Buspirone, and Plaintiff was scheduled for a follow-up visit in one (1) month. (Tr. 1011).

On July 5, 2011, Plaintiff had a Remicade infusion at CDDA. (Tr. 930). Her weight at this appointment was two hundred seven pounds (207 lbs.). (Tr. 930). Plaintiff reported that she had been having eight (8) to nine (9) loose stools per day, which was normal for her. (Tr. 930). Her exam was positive for fatigue and ankle swelling. (Tr. 931).

On July 11, 2011, Plaintiff had an appointment with Dr. Mania. (Tr. 1005). She reported that she felt better, did not have as much anxiety, and that she occasionally felt a strange feeling in her head as well as mild palpitations. (Tr. 1005). She was on the wait list for therapy. (Tr. 1005). She stated that her job was going well and was not stressful. (Tr. 1005). Her Axis I description included GAD and Panic Disorder. (Tr. 1005). Her affect was appropriate, her mood was anxious, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 1006). Dr. Mania instructed Plaintiff to continue on the Lorazepam and to increase the Burspirone, and she was scheduled for a follow-up visit in one (1) month. (Tr. 1007).

31

On August 2, 2011, Plaintiff had an appointment with Dr. Dhanyamraju for musculoskeletal pain. (Tr. 878). Plaintiff complained of pain in her ankles and feet. (Tr. 878). Her exam was completely negative with regards to all systems. (Tr. 879). Dr. Dhanyamraju ordered bloodwork, including an ANA panel. (Tr. 878). Plaintiff's ANA was reported to be elevated, and as a result, she was referred to a rheumatologist. (Tr. 873).

On August 18, 2011, Plaintiff received a Remicade infusion at CDDA. (Tr. 926). She reported that she had been having eight (8) to ten (10) loose stools a day on Remicade, and that two (2) to five (5) days before her infusion, she had as many as twenty (20) loose stools a day. (Tr. 926-927). She also reported that she had joint pain, mainly in her feet and ankles, and an elevated ANA. (Tr. 926). Her exam was positive for joint pain and diarrhea. (Tr. 929).

On August 19, 2011, Plaintiff had an appointment with Dr. Mania. (Tr. 1000). She reported that she had been feeling more anxious recently, with her medical conditions, including a positive ANA and stiff joints, acting as a stressor. (Tr. 1000). She stopped the Buspar because she could not tolerate the increased anxiety it caused. (Tr. 1000). She was still on the wait list for therapy. (Tr. 1000). Her Axis I description included GAD and Panic Disorder. (Tr. 1000). Her affect was appropriate, her mood was anxious, her memory was intact, she was

32

cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 1000-1001). Her GAF score was a sixty-five (65). (Tr. 1001). Dr. Mania instructed Plaintiff to continue taking the Lorazepam, prescribed Propranolol in place of Buspar, and scheduled a follow-up visit for her in one (1) month. (Tr. 1001-1002).

On August 22, 2011, Dr. Berk called Plaintiff, and told her that her rheumatologist thought she had drug-induced Lupus, and to switch her to a different anti-TNF drug. (Tr. 926).

On September 19, 2011, Plaintiff had an appointment with Dr. Mania. (Tr. 995). She reported that her anxiety had been better in general, she was only taking her Lorazepam every couple of days, and she did not try the Propranolol because she was afraid of her new medication. (Tr. 995). Her Axis I description included GAD and Panic Disorder. (Tr. 995). Her GAF was a sixty-five (65). (Tr. 996). Her affect was appropriate, her mood was anxious, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 995-996). Dr. Mania prescribed Xanax in place of Lorazepam, and Plaintiff was scheduled for a follow-up visit in one (1) month. (Tr. 997).

On September 20, 2011, Plaintiff had an appointment with Mark Diehl,

33

M.D. at Wellspan Rheumatology for joint pain mainly affecting her lower extremities including her ankles and feet. (Tr. 757-758). Plaintiff also reported that she had low back pain and stiffness in the morning for about an hour. (Tr. 758). Her exam noted that she was positive for fatigue, weakness, irregular heartbeat, nausea, persistent diarrhea, muscle weakness and tenderness, headaches, sensitivity and pain in her hands and feet, memory loss, loss of concentration, excessive worry, anxiety, depression, and difficulty falling asleep. (Tr. 759). Dr. Diehl stated that Plaintiff had overlap spondyloarthropathy[7] involving Crohn's disease, psoriasis, and inflammatory arthritis. (Tr. 757). Dr. Diehl recommended aggressive treatment, but noted that options were limited due to Plaintiff's fatty liver. (Tr. 757).

On September 26, 2011, Plaintiff had a follow-up appointment with Dr. Berk. (Tr. 920). Plaintiff reported that her Remicade infusion had worn off, and

---

7. The spondyloarthropathies are a group of overlapping chronic
inflammatory rheumatic diseases that includes ankylosing spondylitis
(the prototype of this group), reactive arthritis, psoriatic arthritis,
arthritis of inflammatory bowel disease, and undifferentiated spondylarthritis
(1–4). There can be some overlap in the clinical features of
the spondyloarthropathies, especially in their early stages (1), that may
make it difficult to differentiate between them. However, this overlap
does not usually influence treatment decisions.
http://www.rheumatology.org/assets/0/116/401/408/419/420/e69b1057-caae-436e
-9987-75d1d1e5dede.pdf

Dr. Berk discussed switching her to a different anti-TNF drug. (Tr. 920). Dr.
Berk stated that due to a recent negative endoscopy, her gastrointestinal symptoms
could have been due to her prior bowel resection rather than active Crohn's
disease. (Tr. 920). Plaintiff stated that she had been having at least eight (8)
bowel movements a day, but that she was "used to [it]," and it did not interfere
with her lifestyle in a major way. (Tr. 920). She also noted that if she had work at
five o'clock (5:00) at night, she would try to not eat after ten o'clock (10:00) in the
morning. (Tr. 920). Her active medications list included Remicade, Tylenol,
Aciphex, Vitamin B-12, Calcium, and Vitamin D. (Tr. 921). Her exam was
positive for fatigue, joint pain, back pain, nausea, vomiting, bloating,
regurgitation, diarrhea, abdominal pain, and memory loss. (Tr. 921-922).
Dr. Berk noted that Plaintiff was overweight at two hundred six pounds (206 lbs).
(Tr. 922). Dr. Berk added Sulfasalazine to her medications, and scheduled her for
a follow-up in three (3) months. (Tr. 922).

On September 29, 2011, Plaintiff received a Remicade infusion at CDDA.
(Tr. 918). Plaintiff had continued to have loose stools up to ten (10) times a day.
(Tr. 918). Her joint pain also persisted. (Tr. 919).

On October 17, 2011, Plaintiff had an appointment with Dr. Mania. (Tr.
991). She reported that she had been feeling good, and that the Xanax, which she

used about four (4) times a week for anxiety, had been working. (Tr. 991).  Her

Axis I description included GAD and Panic Disorder.  (Tr. 991).  Her GAF was a

sixty-five (65).  (Tr. 992).  Her affect was appropriate, her mood was euthymic,

her memory was intact, she was cooperative, her thought process was logical, and

her attention, reasoning, impulse control, and judgment were good.  (Tr. 991-992).

Dr. Mania instructed Plaintiff to continue on the Xanax, and Plaintiff was

scheduled for a follow-up visit in one (1) month.  (Tr. 992-993).

On October 31, 2011, Plaintiff had an appointment with Dr. Dhanyamraju.

(Tr. 754).  Her assessment listed the following diagnoses: Crohn's disease, fatty

liver, psoriasis, arthritis of inflammatory bowel disease, and plantar fasciitis.  (Tr.

754).  Plaintiff reported that she had been doing "fairly well" on the Remicade

infusions at the maximum dose.  (Tr. 754).  The history section of this visit states

that Plaintiff was prescribed Sulfasalazine for her Crohn's disease, which helped,

but caused intolerable headaches and nausea.  (Tr. 754).

On November 7, 2011, Plaintiff called Dr. Berk to inform him that she

stopped taking Sulfasalazine because it was giving her headaches and nausea.  (Tr.

917).  She also reported that she felt better since she stopped taking this medicine.

(Tr. 917).  Dr. Berk confirmed that these were side effects of the medicine, and

told her to call her rheumatologist who had suggested this medication if the

upcoming Remicade did not improve her joint pain. (Tr. 917).

On November 14, 2011, Plaintiff had an appointment with Dr. Mania. (Tr. 987). She reported that she had been doing well, her anxiety had been better, and her work hours had been shortened. (Tr. 987). She stated that she only took Xanax two (2) to three (3) times a week. (Tr. 987). Her Axis I description included GAD and Panic Disorder. (Tr. 987). Her GAF was a sixty-five (65). (Tr. 988). Her affect was appropriate, her mood was euthymic, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 987-988). Plaintiff was instructed to continue the Xanax as needed, and was scheduled for a follow-up visit in one (1) month. (Tr. 989).

On November 23, 2011, Plaintiff had a Remicade infusion performed at CDDA. (Tr. 914). Plaintiff stated that overall she had been feeling well since her last infusion, with no negative changes in her gastrointestinal status. (Tr. 914). She was still experiencing seven (7) to ten (10) loose stools daily, but denied having abdominal pain or passing blood or mucus. (Tr. 914). She also reported that she continued to experience back pain and psoriasis, both of which were helped by the Remicade. (Tr. 915). Her exam was positive for fatigue, joint pain, back pain, and mouth sores. (Tr. 915).

37

On December 6, 2011, Plaintiff had an appointment with Dr. Mania. (Tr. 982). She reported that she had been experiencing increased situational anxiety, and needed a Xanax refill to get her through the increased stress. She was still on the wait list for therapy. (Tr. 982). Her Axis I description included GAD and Panic Disorder. (Tr. 982). Her GAF was a sixty-five (65). (Tr. 983). Her affect was appropriate, her mood was euthymic, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 983). Plaintiff was instructed to continue the Xanax as needed, and was scheduled for a follow-up visit in one (1) month. (Tr. 984).

On December 30, 2011, Plaintiff presented to the ER at Chambersburg Hospital for back pain complaints. (Tr. 746). She was diagnosed with an acute lumbar sprain, and was prescribed Vicodin and Flexeril. (Tr. 746).

On January 3, 2012, Plaintiff had an appointment at Keystone Family Medicine with Daria Pellegrino, PAC for achy, shooting lower back pain that radiated into her right foot and was aggravated by flexion, running, sitting, twisting, and walking. (Tr. 866). An x-ray of Plaintiff's lumbosacral spine was ordered to evaluate her back pain, and the results of this x-ray were normal. (Tr. 861, 868).

On January 11, 2012, Plaintiff received a Remicade infusion at CDDA. (Tr. 911). Plaintiff reported that she had been feeling well since her last infusion with no abdominal pain or cramping, and with formed stools daily. (Tr. 912). Her exam was negative for all systems reviewed. (Tr. 912-913).

On January 16, 2012, Plaintiff had a follow-up appointment with James Owens, M.D. at Keystone Family Medicine after her ER visit for back pain on January 3, 2012. (Tr. 861). She reported that she had been feeling better and that her back pain was relieved by medication. (Tr. 861). Plaintiff was pregnant at the time of the exam. (Tr. 863). Dr. Owens prescribed physical therapy for Plaintiff. (Tr. 861).

On January 16, 2012, Plaintiff had an appointment with Dr. Mania. (Tr. 978). She reported that she had been doing ok, that her anxiety would come and go, and that she took Xanax, but not on a daily basis. (Tr. 978). She also had attended an appointment with a therapist. (Tr. 978). Her Axis I description included GAD and Panic Disorder. (Tr. 978). Her GAF was a sixty-five (65). (Tr. 979). Her affect was appropriate, her mood was euthymic, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 979). Plaintiff was instructed to continue the Xanax as needed, and was scheduled for a follow-up

visit in one (1) month. (Tr. 980).

On February 17, 2012, Plaintiff had an appointment with Dr. Mania. (Tr. 973). She reported that she had been doing ok, denied feeling anxious often, and still took the Xanax, but not as often. (Tr. 973). Her Axis I description included GAD and Panic Disorder. (Tr. 973). Her GAF was a sixty-five (65). (Tr. 974). Her affect was appropriate, her mood was euthymic, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 974). Plaintiff was instructed to continue the Xanax as needed, and was scheduled for a follow-up visit in one (1) month. (Tr. 975).

On March 14, 2012, Plaintiff had a follow-up appointment with Dr. Diehl for spondyloarthropathy. (Tr. 1038). Dr. Diehl noted that Plaintiff's joints, mainly the ones involving her hips and feet, had become more painful, but that her back pain was more mechanical in nature. (Tr. 1038). Plaintiff denied any problems in the Review of Symptoms section, and her entire exam was unremarkable and within normal limits, including her fingers, wrists, elbows, shoulders, skin, extremities, gait, and head. (Tr. 1039-1040). Dr. Diehl prescribed Entocort for Plaintiff's Crohn's and arthritis. (Tr. 1038).

On March 16, 2012, Plaintiff had an appointment with Dr. Mania. (Tr.

970).  She reported that she had been doing ok, her anxiety had been exacerbated by her medical conditions, she had not been using too much Xanax, she had problems with concentration, listening to people, and remembering their orders at work, and that she felt "absent." (Tr. 970).  Her Axis I description included GAD and Panic Disorder. (Tr. 970).  Her GAF was a sixty-five (65). (Tr. 971).  Her affect was appropriate, her mood was euthymic, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 971).  Plaintiff was instructed to continue the Xanax as needed, and was scheduled for a follow-up visit in one (1) month. (Tr. 972).

On March 19, 2012, Plaintiff attended physical therapy with Tammy Kegerreis, PT at Summit Physical Medicine and Rehabilitation for lumbar pain that was chronic and intermittent and involved flares that caused an inability to walk for a few days at a time. (Tr. 1042-1043).  Plaintiff reported that she had a constant low level of pain rated at a three (3) to four (4) out of ten (10), but that during a flare, her pain increased to a ten (10) out of ten (10). (Tr. 1043).  She also stated that even sneezing could cause severe pain in her back, and that she had limitations with standing, walking, and driving due to the back pain. (Tr. 1044).  Her listed problems were an activities of daily living ("ADL") impairment,

pain in her lower back that radiated bilaterally to her legs and feet, radicular spasms, decreased range of motion in flexion and sidebending, decreased flexibility in her hamstrings and hips, and decreased strength. (Tr. 1043-1044). Her treatment plan included attending therapy sessions twice a week for six (6) weeks and involved both exercise and therapeutic activities. (Tr. 1042-1043).

On March 26, 2012, Plaintiff had another physical therapy session at Summit Physical Medicine and Rehabilitation. (Tr. 1056). Plaintiff stated that her back pain was not "too bad" that day and rated it at a five (5) out of ten (10). (Tr. 1056). Plaintiff received electrical stimulation and treatment with heat. (Tr. 1056).

On April 3, 2012, Plaintiff had a follow-up visit with Dr. Berk. (Tr. 1034). Plaintiff reported that she was still having bouts of abdominal cramping and diarrhea a couple of days a week. (Tr. 1034). She also noted that she had been significantly bothered by her joint pain, despite taking Entocort as prescribed by Dr. Diehl. (Tr. 1034). Her exam was positive for fatigue, palpitations, joint pain, back pain, difficulty swallowing, bloating, regurgitation, diarrhea, abdominal pain, rectal bleeding, headaches, memory loss, depression, feeling cold, and mouth sores. (Tr. 1035-1036). Dr. Berk noted that Plaintiff's Crohn's disease was in

42

remission as of January 2010 per an endoscopy, and attributed her gastrointestinal symptoms to her prior bowel resection and altered motility from the Crohn's disease. (Tr. 1036). Dr. Berk ordered a repeat colonoscopy to be performed in January of 2013, and Plaintiff was to call if her symptoms worsened. (Tr. 1035-1036).

On April 9, 2012, Plaintiff had an appointment with Dr. Mania. (Tr. 965). She reported that she had been doing ok, that she "came to fill out forms for lawyers" because she was applying for disability, and that she had been doing well taking Xanax every other day. (Tr. 965). Her concentration was still problematic, and she was not in therapy anymore because she did not have enough time. (Tr. 965). She was still working as a waitress, and was doing well mentally at work, but her medical conditions were taking a toll on her. (Tr. 965). Her Axis I description included GAD and Panic Disorder. (Tr. 965). Her GAF was a sixty-five (65). (Tr. 964). Her affect was appropriate, her mood was euthymic, her memory was intact, she was cooperative, her thought process was logical, and her attention, reasoning, impulse control, and judgment were good. (Tr. 965). Plaintiff was instructed to continue the Xanax as needed, and was scheduled for a follow-up visit in one (1) month. (Tr. 967).

On April 17, 2012, Plaintiff attended physical therapy at Summit Physical

Medicine and Rehabilitation. (Tr. 1041). Her treatment plan remained the same from her initial intake on March 19, 2012, including attending therapy sessions twice a week and involving both exercise and therapeutic activities. (Tr. 1041).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive DIB and SSI, the plaintiff must demonstrate he/she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905 (defining disability).  Further,

> an individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding

sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe[8] or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the RFC to return to his or her past work and (5) if not, whether he or she can adjust to other work in the national economy. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the Social Security Administration to show that the

_____

8. An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921.

claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]. " Id.

As part of step four, when a claimant's impairment does not meet or equal a listed impairment, the Commissioner will assess the RFC. See 20 C.F.R. § 416.920. RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The RFC assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'[RFC]' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

Using the RFC assessment, the Commissioner will determine whether the claimant can still perform past relevant work, or can make an adjustment to other work. Id. If so, the claimant is not disabled; and if not, he is disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citing Ramirez v.

48

Barnhart, 372 F.3d 546, 550 (3d Cir. 2004)).  "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]. " Id.

## ALJ DECISION

Initially, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 20, 2014.  (Tr. 13).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her onset date of July 9, 2009.  (Tr. 13).

At step two, the ALJ determined that Plaintiff suffered from the severe combination of impairments of the following: "Crohn's disease, obesity, depression, and anxiety (20 C.F.R. 404.1520(c))."  (Tr. 13).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 14).

At step four, the ALJ determined that Plaintiff had RFC to perform light work as defined in 20 CFR § 404.1567(b),

> [E]xcept that she requires work that allows for access to a

restroom; she is limited to unskilled work (work that requires little or no judgment to do simple things and that can be learned on the job in thirty days or less with little vocational preparation); she has moderate restriction (more than slight limitation, but the function can still be performed on a consistent enough basis to be satisfactory to an employer) in understanding, remembering, and carrying out detailed instructions, responding appropriately to changes in a work setting, performing activities within a schedule, completing a normal workday and workweek without an unreasonable number and length of rest periods due to psychologically based symptoms, and interacting appropriately with supervisors and the public; and she is limited to working in a low stress environment (with low stress being defined as requiring only occasional decision making and no fast paced production quotas).

(Tr. 15). In consideration of Plaintiff's RFC, the ALJ determined Plaintiff was unable to perform any past relevant work. (Tr. 23).

At step five, the ALJ found that given Plaintiff's age, education, work experience, and RFC, there were jobs that existed "in significant numbers in the national economy that Plaintiff could perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 23-24).

The ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between the onset date of July 9, 2009, and the date of the ALJ's decision. (Tr. 24).

**DISCUSSION**

On appeal, Plaintiff challenges the ALJ's RFC determination on the following grounds: (1) the ALJ erred in failing to give appropriate weight to or explain how he assessed Dr. Berk's opinion; (2) the ALJ erred in failing to explain whether the RFC findings included flare-ups of Plaintiff's Crohn's disease; (3) the ALJ erred in failing to properly evaluate Plaintiff's mental impairments; and (4) the ALJ erred in failing to find Plaintiff credible. (Doc. 19, p. 9). Defendant disputes these contentions. (Doc. 20, pp. 14-27).

### 1.   **Medical Opinion Evidence**

Plaintiff asserts that the ALJ erred in failing to apply the treating physician rule while evaluating the medical opinion evidence. (Doc. 19, pp. 11-14). She contends that if the ALJ was "not clear on what Dr. Berk's opinion was on Plaintiff's level of functioning, he was obligated to recontact Dr. Berk. . . ." (Id. at 13). Further, Plaintiff asserts that even if the treating source's opinion is not well-supported by medical evidence, or is inconsistent with the other substantial evidence, according to Social Security Rule 96-2p, while this opinion need not be given controlling weight, it still cannot be rejected, and must be given deference. (Id. at 13-14).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS

100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)). Therefore, the ALJ has a duty to discuss all opinion evidence, and to provide an adequate explanation for rejecting an opinion of a treating physician.

In the present case, with regards to Plaintiff's Crohn's disease, the ALJ afforded significant weight to Dr. Mazza's opinion that Plaintiff could return to work in July of 2009. (Tr. 22, 389). Based on a review of the record, it is determined that no other physician, including Dr. Berk, offered an opinion as to Plaintiff's ability to work or any functional limitations resulting from Plaintiff's Crohn's disease or her other gastrointestinal impairments. Therefore, while it is true that Dr. Berk was one of Plaintiff's treating physicians, because Dr. Berk did not render an opinion regarding any functional limitations Plaintiff had a result of her Crohn's disease, or any other impairment, the ALJ had no obligation to discuss or assign weight to the evidence involving Dr. Berk.

Furthermore, the ALJ had no duty to further develop the record regarding the medical opinion evidence because Plaintiff retains the burden of proving her disability. 20 C.F.R. §§ 404.1512, 1513(d); see Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005). Therefore, the ALJ did not err in the weight he afforded to the medical opinion evidence because Dr. Berk did not render an opinion

regarding Plaintiff's functional limitations resulting from her gastrointestinal, or any other, impairments.

### 2.   **RFC and Crohn's Disease Flares**

Plaintiff argues that the ALJ failed to clarify whether or not the RFC included flare-ups of her Crohn's disease, and this failure was therefore not in accordance with Social Security Ruling 96-8p, which mandates that an ALJ determine the most a claimant can do. (Doc. 19, pp. 14-15). Plaintiff asserts that if the ALJ's RFC determination was the least she could do, then he did not comply with the mandates of Social Security Ruling 96-8p. (Id. at 15).

RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The RFC assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'[RFC]' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."). Additionally, the standard used to support an ALJ's RFC finding is substantial evidence, which requires only more than a scintilla of

54

evidence, but less than a preponderance.  Brown, 845 F.2d at 1213.  Ultimately, the final responsibility for determining a claimant's RFC is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).

Upon review of the ALJ's decision, it is determined that the ALJ gave consideration to and accounted for Plaintiff's Crohn's disease flares in determining the RFC, and that his RFC determination was supported by substantial evidence of record.  The ALJ acknowledged the severity and frequency of Plaintiff's flare-ups because he acknowledged that: (1) Plaintiff never knew when the flares would occur; (2) Plaintiff's abdominal pain and diarrhea occurred daily and increased during flares; (3) Plaintiff had missed a couple of days while working as a waitress due to her Crohn's flares; (4) that during a flare, which occurred about two (2) days per week, Plaintiff would have to use the bathroom up to twenty (20) times a day; and (5) that Plaintiff did not eat before work so that she would not have to use the bathroom as much, but that she would then have to eat later at night, which would interrupt Plaintiff's sleep due to more frequent night-time bathroom trips. (Tr. 16-18).  The ALJ also discussed how Plaintiff testified that her Crohn's disease flare-ups did not prevent her from working as a waitress part-time, did not affect her lifestyle, and did not prevent her from performing many activities of daily living, such as taking care of her children, cleaning the

house for four (4) hours, doing the laundry, mowing the lawn, preparing meals, shopping for groceries, driving a car, or looking for more part-time work. (Tr. 16-19, 22, 35, 39-41, 164, 166-167). In consideration of this evidence, the ALJ included a restriction in Plaintiff's RFC that she be given access to a restroom. (Tr. 15).

Therefore, the ALJ acknowledged Plaintiff's Crohn's disease flares and the impact these flares had on her daily life and ability to work. (Tr. 15-19). The ALJ then formulated the RFC assessment accordingly as he provided that Plaintiff be given access to a restroom. (Tr. 15-19). As such, upon review of the record and the ALJ's decision, it is determined that ALJ's RFC finding regarding the limitations Plaintiff had a result of her Crohn's disease in total, including flare-ups, is supported by substantial evidence.

### 3.  **Mental Health Impairment Analysis**

Plaintiff asserts that the ALJ erred in failing to properly evaluate Plaintiff's mental health impairments because the Diagnostic and Statistical Manual no longer endorses the GAF scoring system, and the ALJ inappropriately gave significant weight to Plaintiff's GAF scores over fifty (50). (Doc. 19, pp. 15-16).

Initially, at the time the ALJ rendered his decision, the GAF scoring system was still endorsed by the Diagnostic and Statistical Manual because the manual

did not abandon this system until it's 2013 publication. Therefore, at the time he made his decision in February of 2012, it was reasonable for the ALJ to consider Plaintiff's GAF scores in analyzing her mental health impairments and her ability to function as a result of these impairments.

In his opinion, the ALJ gave limited weight to Plaintiff's GAF scores of fifty (50) because they were inconsistent with the record as a whole. (Tr. 22). Instead, the ALJ gave significant weight to the GAF scores of fifty-five (55) and higher because they were "more in line with the overall relatively benign clinical findings and treatment history. . . ." (Tr. 22). In reviewing the record, it is noted that on many occasions, Plaintiff noted that she had been doing well or "ok," that her anxiety was relatively under control, that she only needed to take Xanax on average three (3) times a week for anxiety symptoms, and that she was able to work and get along with others despite her anxiety. (Tr. ___). Furthermore, Plaintiff was assigned a GAF score of fifty-five (55) and over on twelve (12) occasions, and was assigned a score of fifty (50) or less on only four (4) occasions. (Tr. 342, 345-346, 348, 351-352, 964, 971, 974, 979, 983, 988, 992, 996, 1001). In fact, Plaintiff was assigned her original intake score of sixty-five (65) on a repeated basis when seen at Keystone Behavioral Health from April of 2011 to April of 2012. (Tr. 964, 971, 974, 979, 983, 988, 992, 996, 1001). Therefore,

based on a review of Plaintiff's mental health medical records, there is substantial evidence to support the ALJ's analysis of Plaintiff's mental health impairments and his decision to afford significant weight to Plaintiff's GAF scores of fifty-five (55) or higher.

### 4. Plaintiff's Credibility

Plaintiff asserts that the ALJ erred in finding Plaintiff was not fully credible. (Doc. 19, pp. 16-18). Plaintiff asserts that in determining Plaintiff's RFC, the ALJ failed to acknowledge Plaintiff's Crohn's disease flare-ups that prevented her from being able to work or perform activities when these flares occurred. (Id. at 16). Plaintiff also contends that the ALJ failed to apply Social Security Rule 96-7p, which requires the ALJ to give a specific reason for a credibility finding that must be clear as to what weight the ALJ gave to the individual's statements and the reasons for that weight. (Id. at 17). She also asserts that the ALJ failed to take into account the medical treatment Plaintiff attempted in order to obtain symptom relief. (Id. at 17-18).

As part of step four of the sequential evaluation process, once an ALJ concludes that there is a medical impairment that could reasonably cause the alleged symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to

work." Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)).  This

"requires the ALJ to determine the extent to which a claimant is accurately stating

the degree of pain or the extent to which he or she is disabled by it."  Id.  In

evaluating the intensity and persistence of a claimant's symptoms, an ALJ should

consider (1) the claimant's history; (2) medical signs and laboratory findings; (3)

medical opinions; and (4) statements from the claimant, treating and non-treating

sources, and other persons about how the claimant's symptoms affect him/her.

See 20 C.F.R. § 404.1529.  Importantly, "[a]n individual's statements about the

intensity and persistence of pain or other symptoms or about the effect the

symptoms have on his or her ability to work may not be disregarded solely

because they are not substantiated by objective medical evidence."  1996 SSR

LEXIS 4 (1996); 20 C.F.R. § 404.1529(c)(2).

"Generally, 'an ALJ's findings based on the credibility of the applicant are

to be accorded great weight and deference, particularly since an ALJ is charged

with the duty of observing a witness's demeanor and credibility.'"  Fell v. Astrue,

2013 U.S. Dist. LEXIS 167100, *29 (M.D. Pa. 2013) (Conaboy, J.) (quoting

Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997));

Frazier v. Apfel, 2000 WL 288246 (E.D. Pa. 2000).  Social Security Ruling 96-7p

gives the following instructions in evaluating the credibility of the claimant's

statements:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.  "In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work record; and (8) the plaintiff's demeanor during the hearing." Jury v. Colvin, 2014 U.S. Dist. LEXIS 33067, *33 (M.D. Pa. 2014) (Conner, J.) (citing 20 C.F.R. § 404.1529(c)(3)).

In assessing Plaintiff's credibility in this case, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms;

> however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.

> Allegations concerning symptoms and limitations are undermined by the relatively benign clinical and laboratory findings and the limited degree of treatment required. . . .

> [Further,] [i]n terms of activities of daily living, [Plaintiff] reported no problems with personal care and also reported that she cares for her six-year-old and 14-month-old children, and that she drives, shops, prepares meals, does cleaning, laundry, ironing, sweeps the floor, does dishes, reads, watches television, cleans the bathroom, helps her daughter with homework, gets her daughter off to school and gets her from the bus, and mows the lawn if she has to. [Plaintiff] was even working part-time after the alleged onset date (Ex. 3E and Testimony). Such activities are not indicative of totally debilitating limitations of function. Additionally, the fact that she was working part-time after the alleged onset date as a waitress tends to suggest that she is able to do more than she alleged.

(Tr. 18, 22). Thus, the ALJ considered the aforementioned <u>Jury</u> factors in his analysis, including daily activities, treatment and measures used to relieve symptoms, and the duration, frequency and intensity of Plaintiff's symptoms, which is evident in the resulting restrictive RFC finding. (Tr. 15).

Upon review of the record and the ALJ's decision, it is determined that there is substantial evidence to support the ALJ's finding regarding Plaintiff's credibility. The ALJ is correct that there were enough inconsistencies in the record

regarding Plaintiff's self-reported limitations that weakened her credibility.  In the Function Report, Plaintiff indicated that she got her daughter ready for school, fed her children breakfast, got her daughter on the bus, cleaned her house, attended doctor's appointments, got her daughter off the bus, made dinner, bathed her daughter, did not have problems taking care of her personal needs, went to the grocery twice a month for an hour at a time, prepared meals daily for a half hour to an hour at a time, cleaned her house daily for four (4) hours at a time, did the laundry, ironed, mowed the lawn, drove a car, did not have problems walking, and did not have issues following either written or spoken instructions.  (Tr. 164-170).

At her hearing, Plaintiff indicated that she had worked part-time as a waitress since July of 2009 for four (4) hours a day, five (5) days a week, and was able to get her daughter off to school, do the dishes, sweeping the floor, watch television, read, and fold the laundry.  (Tr. 36, 40-41).

In conclusion, the ALJ considered the appropriate factors in assessing Plaintiff's credibility, and was correct that there were enough inconsistencies in the record to undermine her credibility.  The ALJ did not find Plaintiff's statements as non-credible, but instead found these statements credible only to the extent that they were inconsistent with the RFC.  (Tr. 18).  The restrictive RFC finding is evidence that ALJ found Plaintiff credible to some degree, albeit not

completely, as the ALJ concluded Plaintiff could perform only light work based, in part, on her subjective complaints. (Tr. 15-19). Also, as mentioned, the ALJ's credibility finding is to be accorded great deference. See Fell, 2013 U.S. Dist. LEXIS 167100, *29 . As such, it is determined that there is substantial evidence to support the ALJ's credibility finding.

## CONCLUSION

Based upon a thorough review of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed, and the appeal will be denied.

A separate Order will be issued.

**Date**: November 21, 2014

_____
United States District Judge

63